## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AETNA INC.,<br>AETNA HEALTH HOLDINGS, LLC, and<br>AETNA HEALTH MANAGEMENT, LLC,<br><br>      Plaintiffs,<br><br>      v.<br><br>LABORATORY CORPORATION<br>OF AMERICA HOLDINGS,<br><br>      Defendant. | CIVIL ACTION<br>NO. _____<br><br><br>__JURY TRIAL DEMANDED__ |

## COMPLAINT

This action is brought by Plaintiffs, Aetna Inc., Aetna Health Holdings, LLC and Aetna Health Management, LLC (collectively "Plaintiffs"). Plaintiffs seek injunctive and monetary relief as a result of wrongful conduct by Defendant Laboratory Corporation of America Holdings ("LabCorp").

1.     This matter arises out of Defendant LabCorp's malicious scheme to continue to receive revenue from Plaintiffs after LabCorp had lost its bid to renew its contract as Plaintiffs' national in-network provider of laboratory services. Recognizing that the loss of Aetna's in-network business would negatively effect its earnings, Defendant LabCorp, using, *inter alia*, confidential and proprietary information obtained from Plaintiffs when LabCorp was their in-network provider of laboratory services, purposefully sought to confuse and mislead Plaintiffs' members and their doctors into believing that Plaintiffs' members would receive the same services at the same in-

network rates that had applied when LabCorp was an in-network provider of laboratory testing services.

2.     LabCorp's scheme was designed to mislead and confuse Plaintiffs' members and their doctors so that they would refer those patients' laboratory tests to LabCorp, instead of Plaintiffs' in-network provider of such services.  As a result of LabCorp's intentional scheme, Plaintiffs' members' laboratory tests were sent to LabCorp and, therefore, Plaintiffs were forced to pay more money for such services than they would have done so if such tests had been sent to Plaintiffs' in-network provider and Defendant LabCorp received payments that it would not have received had such tests been properly sent to Plaintiffs' in-network provider of laboratory services.

## JURISDICTION AND VENUE

3.     Jurisdiction exists pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of jurisdiction).  The matter in controversy and value of the relief sought herein exceeds the sum or value of $100,000.00, exclusive of interest and costs.  This Court also has supplemental jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1367.

4.     Venue in this Court is proper as Aetna Inc.'s principal place of business is in this District.  Venue is also proper in this District as the unlawful conduct described herein was directed toward Aetna and its facilities in this District and towards patients and doctors who live in this District.  Further, Defendant regularly conducts business in this District including but not limited to the negotiation of agreements and the performance of services related to the instant dispute.

## THE PARTIES

5.    Plaintiff Aetna Inc. ("Aetna") is a Pennsylvania corporation headquartered in Connecticut and with a principal place of businesses at 980 Jolly Road, Blue Bell, Pennsylvania.

6.    Plaintiff Aetna Health Holdings, LLC ("Aetna Health") is a Delaware corporation with a principal place of business in Hartford, Connecticut. Aetna Health Inc. (Texas), Aetna Health of California, Inc., Aetna Health Inc. (Connecticut), Aetna Health Inc. (Florida), Aetna Health Inc. (Georgia), Aetna Health Inc. (Pennsylvania), Aetna Health Inc. (New Jersey), Aetna Health Inc. (Maine), Aetna Health Inc. (Washington), Aetna Health Inc. (New York) and Aetna Health Inc. (Michigan) (hereinafter the "HMO Subsidiaries") are wholly-owned subsidiaries of Aetna Health.

7.    Plaintiff Aetna Health Management, LLC ("hereinafter "AHM") is a wholly-owned subsidiary of Aetna Health, and is a Delaware corporation with a principal place of business in Hartford, Connecticut.

8.    Aetna Health is a wholly-owned subsidiary of Aetna, one of the nation's leading diversified health care benefits companies, serving approximately 36.1 million people with information and resources to help them make better informed decisions about their healthcare.

9.    Defendant Laboratory Corporation of America Holdings ("LabCorp" or "Defendant") is a Delaware Corporation and its principal offices are located in Burlington, North Carolina.

3

## BACKGROUND FACTS

### A.   Provider Networks

10.   Central to Aetna's business is a network of preferred providers that provides quality healthcare to Aetna members and promotes efficiency and cost containment in the provision of medical services to Aetna members.

11.   Aetna provides health benefits plans and insurance policies that include "in-network" benefits for services rendered to Aetna members and insureds through a network of medical providers who have entered into contracts with the HMO Subsidiaries and AHM.

12.   Medical providers who enter into contracts with Aetna are commonly known as "participating" providers, and the contracts between Aetna and participating providers require the participating providers to accept negotiated payment for services as payment in full.  The Aetna member ordinarily has no further financial obligation to the participating provider beyond a small fixed co-payment or plan deductibles.

13.   These provider contracts allow Aetna to deliver healthcare benefits efficiently thorough its provider network, to anticipate and control the costs of care, to reduce its financial risks for insured plans, and to credential providers through its credentialing and peer-review process.

### B.   Out-of-Network Providers

14.   Aetna provides healthcare benefit plans and insurance policies that provide "out-of-network" benefits for services rendered by "non-participating" providers who have not entered into contracts with Aetna and have not agreed to accept negotiated

payments as payment in full for services rendered. Non-participating providers set their own fees for services subject to the laws and regulations that govern their practices.

15.     Pursuant to the terms of Aetna's benefit plans and insurance policies, Aetna reimburses eligible charges for services rendered by non-participating providers subject to the coinsurance, deductible and other patient responsibility set forth in the benefit plan or insurance policy. Additionally, these benefit plans and insurance policies may limit the covered benefits for out-of-network services.

16.     Pursuant to the terms of Aetna's benefits plans and insurance policies, the member is responsible for payment of coinsurance, deductibles and other amounts which comprise a part of the charges submitted by non-participating providers. Coinsurance is a portion, typically 30%, of the allowed amount for services rendered by non-participating providers.

17.     Pursuant to the terms of the benefit plans and insurance policies, Aetna ordinarily pays only a fixed percentage, typically 70%, of the eligible charges for services rendered by non-participating providers subject to the deductible and other benefit limits.

18.     The provisions of the benefit plans and insurance policies that make the covered person responsible for payment of coinsurance, deductibles and other amounts are material to the terms of the benefit plans and insurance policies provided by Aetna.

19.     Among other things, the provisions of the benefit plans and insurance policies that make the covered person responsible for payment of coinsurance, deductibles and other amounts for services rendered by non-participating providers protect the integrity of Aetna's network of medical providers, require subscribers to

consider and share in the cost of healthcare services, affect Aetna's ability to control the costs of medical care and encourage participation in its networks by healthcare providers.

20.    Under the terms of the benefit plans and insurance policies, Aetna is under no obligation to pay claims or to provide coverage for services rendered by non-participating providers unless the covered person is responsible for the payment of incurred charges, including coinsurance, deductibles and other payments applicable to out-of-network benefits.

**B.    The Nature Of The Confidential Relationship Of The Parties**

21.    From approximately the late 1990s until July 1, 2007, AHM and LabCorp entered into a series of National Ancillary Service Agreements, addenda and related services agreements (the "Agreements") pursuant to which LabCorp provided covered laboratory services to Aetna members under payment terms pursuant to a services and compensation schedule and subject to any applicable copayments, coinsurance or deductibles applicable to the services rendered pursuant to the member's plan.

22.    The terms of those agreements included, *inter alia*, that LabCorp would not charge or "balance bill" members any more than the agreed upon compensation.

23.    LabCorp recognized that during the course of the Agreements it obtained confidential and proprietary information that was not to be used by LabCorp for any reason after the Agreements terminated.

24.    Indeed, the parties expressly agreed that they would obtain each others' confidential and proprietary information. *See e.g.* Exhibit "A" hereto at § 4.7.[1] The

---

[1] The December 1, 2004 Agreement between the parties contains confidentiality provisions. As a reasonable step to preserve the confidentiality of proprietary information, including the terms of the Agreements, Plaintiffs only generally reference

parties also agreed not to use the confidential information of another party to the Agreements.

25.     LabCorp, pursuant to the Agreements, gained access to large amounts of provider and non-public confidential member information relating to Aetna's participating physicians and members.

26.     Specifically, during the course of performing under these Agreements, LabCorp came to know the identity of, contact information for and unique characteristics of Aetna's network providers.

27.     As a result of LabCorp's relationship with Aetna, it also became aware of which Aetna Members utilized their services and which Aetna network providers utilized their services when providing services to Aetna Members.

28.     Further during the course of this confidential relationship, LabCorp became aware that Aetna participating physicians agreed to use participating networks in order to maximize the members' plan benefits and provide utilization review/quality management.

C.     **Aetna Terminates LabCorp's Contract**

29.     In 2006, Aetna issued a Request for Information to its Lab Providers relating to provision of laboratory services to Aetna members.

30.     In fiscal year 2006, Aetna paid approximately one hundred million dollars ($100,000,000.00) to LabCorp for services provided to Aetna Members. LabCorp was a participating provider in Aetna's network for fiscal year 2006.

---

the provisions of the Agreements to provide Defendant notice of the terms and conditions relevant to Plaintiffs' claims, as required under the Federal Rules of Civil Procedure. Simultaneously with the filing of the instant complaint, Plaintiffs are filing a Motion for Leave to File Agreement Under Seal.

31.     In March of 2007, Aetna notified LabCorp that it would no longer be a participating provider in Aetna's network as of July 1, 2007.

32.     On March 1, 2007, LabCorp quickly issued a press release announcing that: "it will no longer be a contracted laboratory provider for Aetna Inc." effective July 1, 2007.  LabCorp's press release also informed investors that it was reducing its estimated 2007 earnings per share by $.04 "primarily as a result of this contract termination."  The loss of this contract with Aetna was viewed unfavorably by business analysts and resulted in a more than ten percent (10%) decline of LabCorp's publicly traded stock.

**D.     LabCorp Improperly Schemes to Continue Receiving Revenues Relating to Aetna Members**

33.     On or about June 8, 2007, LabCorp unilaterally sent letters to participating providers in Aetna's network.  The letters, among other things, stated: "As you know, Aetna terminated our contract effective July 1, 2007.  At that time, LabCorp will become a non-participating provider with Aetna."  The letters also stated: "[o]ur commitment to you is that your Aetna patients will not pay more for services performed at LabCorp after July 1, 2007 than they would pay if the services were performed by an in-network laboratory provider."  Upon information and belief, these letters were sent to providers who, *inter alia*, had previously referred Aetna members to LabCorp while LabCorp was a participating provider in Aetna's network.

34.     Sometime after July 1, 2007 LabCorp began submitting claims to Aetna for Aetna members for whom LabCorp had waived coinsurance, deductibles and other patient responsibility.  Upon information and belief, LabCorp misrepresented its actual

charges for services to these patients and submitted claims for amounts that Aetna was not obligated to pay.

35.    A "chargemaster" is a tool used by providers to charge payors for procedures, services and supplies provided to Members.   In order to appear more competitive, LabCorp reduced its chargemaster after it was no longer under contract with Aetna.   However, in 2008 and 2009, LabCorp began to systematically escalate its charges, thereby increasing Aetna's medical cost liability and the amount billed to Aetna for services provided to Aetna's Members.   As a result of LabCorp's increases to its chargemaster, Aetna paid LabCorp millions of dollars more than it would have paid to its in-network provider for laboratory services.

36.    During February 2008, Aetna sent a letter to its participating providers. The letter, among other things, stated: "[a]s you may know, we ended our relationship with Laboratory Corporation of American (LabCorp) and its affiliates on July 1, 2007. LabCorp and its affiliates are *not* participating with the Aetna network."   The letter also stated: "LabCorp has expressed a willingness to continue to serve your patients; however, please be aware that your Aetna patients' level of benefits may vary if they use LabCorp. This means that patients in HMO-based plans may be subject to balance bills for out-of-network benefits, since some of these plans do not have such coverage.   If your Aetna patients in PPO-based or point-of-service plans seek services from LabCorp, their financial responsibility will be determined by their out-of-network benefits coverage under the plan."

37.    On or about June 26, 2008, LabCorp sent letters to participating providers in Aetna's network which stated, among other things: "[a]lthough LabCorp is a non-

participating provider with Aetna, I want to assure you that we continue to accept and perform laboratory services for your Aetna patients. LabCorp continues to submit claims directly to Aetna for these services and Aetna is reimbursing us in accordance with the member's benefits. Additionally, you should be aware that Aetna has stated that they do not intend to terminate their agreements with physicians for sending testing to LabCorp and that there have been no such terminations since LabCorp became a non-participating provider on July 1, 2007." The letters also stated: "We have implemented a special handling process for Aetna patient bills to verify the patient's in-network benefits and bill the patient accordingly. We are able to determine the patient's in-network benefits, based on information available through Aetna, for approximately 85% of claims billed to Aetna. For the remaining claims, approximately 15% of claims billed to Aetna, this information is not available. In those limited circumstances, we have established a patient bill amount by category (deductible, copayment, coinsurance or some combination thereof) which is $15.00 or less." Upon information and belief, these letters were sent to, *inter alia*, providers who had previously referred Aetna members to LabCorp while LabCorp was a participating provider in Aetna's network.

38.     By letter dated August 1, 2008, Aetna advised LabCorp that its communications to Aetna's participating providers were giving the providers and Aetna members the false impression that Aetna members could continue to receive services from LabCorp at their in-network level of benefits even though LabCorp did not participate in Aetna's network. Aetna also advised LabCorp that its communications were causing "considerable provider and member confusion" and damages to Aetna.

39.   In November of 2009, LabCorp sent letters to providers again stating that, even though it is a non-participating laboratory, "LabCorp continues to submit claims directly to Aetna for these services and Aetna is reimbursing us in accordance with the member's benefits."   Upon information and belief, these letters were sent to providers who had previously referred Aetna members to LabCorp while LabCorp was a participating provider in Aetna's network.

40.   The communications also invited the providers *or their members* to call an 800 number.

41.   LabCorp's representations were not true because these communications gave both providers and Aetna Members the false impression that Aetna Members would continue to receive services from Aetna at the Member's in-network level of benefit costs even though LabCorp facilities no longer participated in Aetna's network.

42.   For example, Aetna Members can be balance billed because they did not have out-of-network benefits.   Some Aetna Members participate in Health Savings Accounts (HSAs).   As a result of Laborp's misconduct, these Members will unknowingly incur higher costs for out-of-network benefits for LabCorp's services because such claims, under the typical HSA agreements, are automatically deducted, as agreed by the Member, from their HSA account.

43.   Similarly, if an Aetna member with a point of service or PPO plan seeks services from LabCorp, their financial responsibility would be determined by the Member's out-of-network benefits.

44.   Further, LabCorp's representation that the Member is billed consistent with the Member's benefits is false because the amount charged by LabCorp is higher than the Member's plan benefits because it does not net the co-pay and thus is inflated.

45.   LabCorp sought to obtain additional out-of-network referrals from Aetna Members by advertising directly to those Members with a brochure that states, "[I]f you are an **Aetna patient** and have a **question about** your LabCorp bill, **call 800-995-1533.**" (emphasis in original).

46.   As a result of LabCorp's false and/or misleading communications, providers did send Aetna's Members laboratory tests to LabCorp rather than to Aetna's in-network service provider, Quest Diagnostics.

47.   As a result of LabCorp's false and/or misleading communications, providers in Aetna's network were confused as to whether LabCorp was in Aetna's network.

48.   LabCorp's false and/or misleading communications caused physicians to believe that LabCorp was an in-network provider or to believe that LabCorp was billing Plaintiffs and their Members as if LabCorp was an in-network provider.

49.   Because physicians believed that LabCorp was an in-network provider or was billing Plaintiffs or their Members at in-network rates, they referred lab tests to LabCorp instead of Aetna's in-network provider for laboratory testing.

50.   Even after Aetna informed certain physicians that LabCorp was a non-par or out of network provider, at least one doctor insisted that LabCorp had provided the doctor with information indicating that LabCorp had some special consideration or agreement with Aetna.  That information was false.  Further, such a response indicates

that not only was LabCorp sending false and/or misleading letters to Aetna's physicians and doctors, but that LabCorp was also systematically communicating, perpetuating or reinforcing the falsehoods and misrepresentations contained in its letters.

51.     LabCorp intended to and did mislead Aetna's in-network providers into believing that LabCorp was an in-network provider and/or into believing that Aetna and LabCorp had a "special consideration" that would not cause Aetna's Members to be billed anything more than in-network charges.

52.     Further, as a result of LabCorp's misconduct, Aetna is forced to expend valuable human resources and expend additional monies processing and reprocessing claims that have been diverted out of Aetna's network as a result of LabCorp's misconduct.

53.     LabCorp's conduct was intentional, malicious and reckless.

54.     As a result of these referrals, Aetna was forced to pay more to LabCorp than it would have if such services were provided by Aetna's in-network laboratory services provider, Quest Diagnostics.

55.     LabCorp's scheme is intended to disrupt and/or interfere with Aetna's valuable business relationship with its participating healthcare providers and its Members by creating the impression that Aetna is improperly charging its members with costs that Labcorp has misrepresented are covered benefits at the preferred rates of a participating provider.

56.     Aetna has been damaged as a result of Defendant LabCorp's conduct as described above.

## Count I
## <u>Violation of the Lanham Act</u>

57.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

58.     LabCorp made false and misleading statements designed to mislead Aetna's participating providers and members that claims it submitted to Aetna would be adjudicated as in-network benefits when LabCorp knew that it was an out-of-network provider.   LabCorp's misconduct was not for any legitimate purpose, but to cause participating providers to refer laboratory tests to LabCorp under the mistaken belief that LabCorp would provide services at identical cost to an in-network service provider.

59.     LabCorp's false and misleading statements are designed to and intended to perpetrate fraud and deceit and to cause participating providers to refer Aetna Members' claims out-of-network to LabCorp.

60.     LabCorp's misconduct is willful, wanton and outrageous, justifying the imposition of punitive damages.

61.     Aetna's products and services at issue, the provision of laboratory services to members, travelled in interstate commerce.  LabCorp's misrepresentations were placed into and substantially affect interstate commerce.

62.     As a direct, proximate and reasonably foreseeable result of LabCorp's misconduct, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other

legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

## Count II
## Unfair Competition

63.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     LabCorp made false and misleading statements designed to mislead Aetna participating providers and members that claims it submitted to Aetna would be adjudicated as in-network benefits when LabCorp knew that it was an out-of-network provider.   LabCorp's misconduct was not for any legitimate purpose, but to cause providers to refer laboratory tests to LabCorp under the mistaken belief that LabCorp would provide services at identical cost to an in network service provider.

65.     LabCorp's false and misleading statements are designed to and intended to perpetrate fraud and deceit and to cause participating providers to refer Aetna Members' claims out-of-network to LabCorp.

66.     LabCorp's misconduct is willful, wanton and outrageous, justifying the imposition of punitive damages.

67.     As a direct, proximate and reasonably foreseeable result of LabCorp's misconduct, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

## Count III
## Violation of State Law Trade Secret Statutes

68.   Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

69.   Aetna possesses trade secrets relating to its confidential and proprietary business interests.  This information, as noted above, consists of information, including formulas, proprietary information relating to the submission and adjudication of claims, information about Plaintiffs' Member's plans, lists of Plaintiffs' doctors and the contact information at their offices and methods for the payment of claims that have independent economic value to Plaintiffs and which are, therefore, kept in a manner intended to maintain their secrecy.

70.   LabCorp gained access to Aetna's trade secrets through its confidential contractual relationship with Plaintiffs when they were Aetna's in-network provider of laboratory services.

71.   LabCorp has used Aetna's confidential and proprietary information, without privilege and in violation of the confidence pursuant to which LabCorp was provided access to such information.

72.   As a direct, proximate and reasonably foreseeable result of LabCorp's conduct, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

## Count IV
## Breach of Contract

73.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

74.     The terms of the December 1, 2004 Agreement between LabCorp and AHM contractually obligated LabCorp not to use Aetna's confidential and proprietary information and not to directly or indirectly solicit Members or providers to compete with Aetna or its affiliates. *See e.g.* Exhibit "A" at §§ 4.7 and 9.3.

75.     LabCorp breached the Agreement by using Aetna's proprietary data, such as the identity of Aetna's in-network providers and the methods pursuant to which Aetna reimburses for in-network services.

76.     By its conduct, LabCorp has also otherwise breached its obligations of good faith and fair dealing under the Agreement.

77.     As a direct, proximate and reasonably foreseeable result of LabCorp's breach of the Agreement, Aetna has suffered damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant and award all such other legal and equitable relief that the Court deems just and proper.

## Count V
## Tortious Interference With Plaintiffs' Contracts With Providers

78.     Plaintiff incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

79.     Plaintiffs have a contractual relationship with providers of medical services.   These contracts require the contracting providers to, *inter alia*, refer Members

to Participating Providers, including for lab work and other medical services to the extent possible.

80. Defendant LabCorp, as a result of its prior contractual dealings with Aetna when LabCorp was Plaintiffs' in-network provider of laboratory services, knew of the contractual relationships between Plaintiffs and their in-network providers.

81. Defendant LabCorp intentionally interfered with Plaintiffs' contractual relationship with their providers by issuing false and/or misleading statements to Plaintiffs' providers that caused such providers to believe that Plaintiffs still treated Defendant LabCorp as an in-network provider.

82. The actions of Defendant LabCorp were taken with the intent to harm Plaintiffs by interfering with Plaintiffs' contractual relationships with providers.

83. Defendant LabCorp intended to and in fact did confuse and mislead Plaintiffs' in-network providers.

84. LabCorp's conduct was not privileged or justified.

85. As a result of LabCorp's misconduct, Plaintiffs' in-network providers referred laboratory tests to LabCorp instead of to Plaintiffs' in-network provider of laboratory services, as required by the contract between the in-network providers and Plaintiffs.

86. As a result of LabCorp's misconduct, Plaintiffs suffered monetary damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other

legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

### Count VI
### Tortious Interference With Plaintiffs' Contract With Quest Diagnostics

87.     Plaintiff incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

88.     Plaintiffs have a contractual relationship with Quest Diagnostics in order to provide Aetna Members with lab work at agreed upon rates.

89.     Defendant LabCorp intentionally interfered with Plaintiffs' contractual relationship with Quest Diagnostics by issuing false and/or misleading statements to Aetna's in-network providers that caused such providers to believe that Defendant LabCorp was Aetna's in-network provider of laboratory services.

90.     The actions of Defendant LabCorp were taken with the intent to harm Plaintiffs by interfering with Plaintiffs' contractual relationships with Quest Diagnostics.

91.     Defendant LabCorp intended to and in fact did confuse and mislead Plaintiffs' in-network providers.

92.     LabCorp's conduct was not privileged or justified.

93.     As a result of LabCorp's misconduct, Plaintiffs' in-network providers referred laboratory tests to LabCorp instead of Quest Diagnostics, Plaintiffs' in-network provider of laboratory services.

94.     As a result of LabCorp's misconduct, Plaintiffs suffered monetary damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant, in an amount in excess of $100,000.00, reasonable investigation

expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.

## Count VII
## Declaratory And Injunctive Relief

95.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

96.     From July 1, 2007 to the present, LabCorp has submitted claims to Aetna for services rendered as a result of its unlawful waivers of coinsurance, deductibles and other patient responsibility.

97.     At all times, LabCorp knew that its waiver of coinsurance, deductibles and other patient responsibility violated and tortiously interfered with the material terms of the benefit plans and insurance policies provided by Aetna, including but not limited to Plaintiffs' contracts with their in-network providers.

98.     LabCorp's waiver of coinsurance, deductibles and other patient responsibility renders the services ineligible for reimbursement under the terms of the benefits plans and insurance policies provided by Aetna.

99.     Aetna has suffered and will continue to suffer irreparable harm as a result of LabCorp's waiver of coinsurance, deductibles and other patient responsibility.

100.    Aetna is entitled to a declaration that LabCorp has tortiously interfered with and violated the terms of the benefit plans and insurance policies provided by Aetna.

101.    Aetna is also entitled to a declaration prohibiting LabCorp's misuse of Plaintiffs' trade secrets and continuing violations of the Lanham Act and state unfair competition laws.

102.   The harm suffered by Aetna resulted from LabCorp's intentional wrongdoing.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant, in an amount in excess of $100,000.00, reasonable investigation expenses, attorneys' fees, costs of suits, interests on all sums owed, and all such other legal and equitable relief that the Court deems just and proper, including exemplary damages as may be allowed by law.


Respectfully submitted,


OF COUNSEL:                          /s/ James C. Crumlish, III ECF #JCC5010
ELLIOTT GREENLEAF&                   JOHN M. ELLIOTT
    SIEDZIKOWSKI, P.C.               JAMES C. CRUMLISH, III
                                     JOHN P. ELLIOTT
                                     Union Meeting Corporate Ctr. V
                                     925 Harvest Drive
                                     Blue Bell, PA  19422
                                     (215) 977-1000

                                     Counsel for Plaintiffs

DATED:  August 19, 2010